MARIA GLIONNA, APPELLEE, V. GERALD E. CHIZEK,
COMMISSIONER OF LABOR, STATE OF NEBRASKA,
APPELLANT, IMPLEADED WITH STUART'S, INC.,
APPELLEE.

281 N. W. 2d 220

Filed July 10, 1979. No. 42324.

James R. Jones and John W. Wynkoop, for appellant.

Warren J. Nash, for appellee Glionna.

Heard before KRIVOSHA, C. J., BRODKEY, WHITE, and HASTINGS, JJ., and MORAN, District Judge.

HASTINGS, J.

This is an appeal by Gerald E. Chizek, Commissioner of Labor, hereinafter called Chizek, from an order of the District Court for Douglas County which reversed the determination of the Appeal Tribunal of the Department of Labor which found that plaintiff had voluntarily left her employment with Stuart's, Inc., without good cause and therefore was not entitled to unemployment compensation benefits. The initial claim had been heard by a claims deputy of the Nebraska Department of Labor who found that plaintiff had left her employment because she was dissatisfied with her job and her reasons

were not of the necessitous and compelling reasons indicated in section 48-628 (a), R. S. Supp., 1976. Testimony was given by both plaintiff and Don Dandy, owner of Stuart's, Inc., before the Nebraska Appeal Tribunal and additional testimony by plaintiff in the District Court.

According to plaintiff she began working for Stuart's, Inc., on April 1, 1976, and worked until September 29, 1977, when by her own action she terminated her employment. She was hired to work from 10 a.m., until 5:30 p.m., 3 days a week, and from 10 a.m., to 6 p.m., 2 days a week. Her pay was $3.50 per hour straight time and then was raised to $4 in about 3 months. At first she was employed as a seamstress, working with one other lady who was more or less in charge. However, the lady in charge quit and other people were hired periodically for a few days at a time, but for the most part plaintiff ran the entire tailor shop by herself. During that period of time she did the fittings, marking, ripping, sewing, and pressing. She said the volume of work increased to the point where she started going to work at 9:30 a.m., skipping lunch and one coffee break, and working as many as 9, 10, and up to 11 hours a day. According to plaintiff, there was "more than one evening" she was ready to leave work for the day when Mr. Dandy asked her to finish the job and she would stay until 6 or 7 p.m. At one point she testified that almost every day Mr. Dandy asked her to work overtime, from 8½ to 11 hours per day. Apparently Mr. Dandy never told plaintiff she would be fired if she did not work overtime, but she knew there was the work to be done, she needed the job, and she would stay late each day until she was finished. At another point in her testimony she said she felt there was a danger of losing her job if she left at the normal quitting time.

Finally, the next to the last day she worked, which was 2 days before she was to take a week's vacation,

there was so much work to do she told Mr. Dandy she could not work 11 hours a day and she could not possibly get the work done before taking her vacation. He replied they would see tomorrow. The next day there was more work on the bench than when she had left. She told him it was more work than humanly possible to do, and Mr. Dandy started to scream, jump up and down, and call her names she had never heard before. She began to shake so much she ran a needle through her finger. Following that last day she claimed she was sick and upset for 2 days.

Mr. Dandy gave a somewhat different version of the events leading up to plaintiff's quitting. He did agree that she oftentimes worked overtime, but claimed she was manager of the tailor shop and could leave at 5:30 p.m., each day, but that she wanted to work longer hours. He did not deny there was that much work to do and that plaintiff did work hard and would get upset. However, he knew she was doing extra work after hours for Aksarben. He testified she was an excellent seamstress and he had tried to hire her back. He also said he sent work to other tailor shops, which plaintiff admitted, but she denied it made any appreciable difference in her workload.

An appeal under the Employment Security Law, sections 48-601 to 48-669, R. R. S. 1943, must be heard by the District Court de novo on the record, although either party may offer additional evidence after proper notice. This court on appeal *must also consider the cause de novo on the record,* meaning that it is our duty to retry the issues of fact involved in the findings complained of and reach an independent conclusion thereof. § 48-639, R. R. S. 1943; A. Borchman Sons v. Carpenter, 166 Neb. 322, 89 N. W. 2d 123 (1958).

Section 48-628, R. S. Supp., 1976, provided in part: "An individual shall be disqualified for benefits:

(a) For the week in which he left work voluntarily *without good cause* * * *." (Emphasis supplied.) The key phrase, of course, is "without good cause." It is obvious that the Employment Security Law does not purport to grant benefits to employees who leave their work purely voluntarily. Woodmen of the World Life Ins. Society v. Olsen, 141 Neb. 776, 4 N.W. 2d 923 (1942). However, if the reason for leaving, voluntarily though it may appear, has some justifiably reasonable connection with or relation to the conditions of employment, it cannot be said that the leaving is "voluntarily without good cause." In Fannon v. Federal Cartridge Corp., 219 Minn. 306, 18 N. W. 2d 249 (1945), where an employee was transferred from one department to another because of allergies and then quit because the environment in the second position made her ill, the court said: "* * * where factors or circumstances directly connected with employment result in illness or disease to an employee and make it impossible for him to continue therein because of serious danger to his health, termination of employment for this reason may correctly be said to be involuntary and for 'good cause attributable to the employer,' even though the employer be free from all negligence or wrongdoing in connection therewith."

The Nebraska Appeal Tribunal, in a decision handed down on November 29, 1943, said that where, because of a lack of help, an employee found the work to be too much for her and quit, "claimant quit with good cause." Appeal Tribunal Decision, No. 136, Vol. VI, 11-29-43. Also found at CCH Unemployment Insurance Reporter, Vol. IB, par. 1975, p. 30,164.

The authorities cited and otherwise referred to above demonstrate that each situation depends upon the particular facts and circumstances therein existing and our decisions in this area must be on a case-by-case basis.

The trial judge in his memorandum and order found that plaintiff's "workload proved too much for her and she became concerned about her physical and mental well being." As he so aptly put it, "The facts of this case parallel the Greek fable concerning the countryman who killed the goose that laid the golden eggs." He concluded plaintiff had sustained her burden of proving that she left her employment with good cause, within the meaning of section 48-628, R. S. Supp., 1976, and was eligible for the benefits provided by law.

We do not say that any time an employee decides he or she does not like the job or that it is burdensome or requires more skill than is possessed by the employee, voluntary termination can be for "good cause." However, we do state that when an *employee* accepts employment in good faith and through no fault or deficiency on his or her part the workload becomes an increasingly unreasonable burden so as to affect the health or sense of well-being of the employee, voluntary termination does have some justifiably reasonable connection with or relation to conditions of employment and may be deemed for *"good cause."* The evidence supports such a finding here, and the judgment of the District Court is affirmed.

AFFIRMED.