327 S.E.2d 403

Fern A. MURRAY

v.

Phyllis J. RUTLEDGE, Clerk of the Circuit Court of Kanawha County; Board of Review of the West Virginia Department of Employment Security, J.F. McClanahan, as Chairman, C.C. Elmore, Jr., and Gregory E. Elliott, as Members; Nile Hughes, as Commissioner; and Marco's Pizza.

No. 16352.

Supreme Court of Appeals of West Virginia.

March 1, 1985.

Garry G. Geffert, W.Va. Legal Services Plan, Inc., Martinsburg, Joseph P. Henry, W.Va. Legal Services Plan, Inc., Charleston, for petitioner.

No appearance for respondents.

McGRAW, Justice:

The appellant, Fern A. Murray, appeals from a final order of the Circuit Court of

Kanawha County which affirmed a decision of the West Virginia Department of Employment Security Board of Review disqualifying her from receiving unemployment compensation benefits based upon a finding that she voluntarily quit her last employment without good cause involving fault on the part of her employer. The appellant asserts that a substantial change in her working conditions justified her resignation. We agree and reverse the order of the circuit court.

The appellant was employed as manager of Marco's Pizza on February 11, 1982, at a salary of one hundred dollars per week, regardless of the number of hours worked. The appellant testified at a hearing before a Department of Employment Security administrative law judge that, "[t]here might be some weeks when I had to work two hours—there might be some weeks when I would have to work sixty." She further testified that she was promised bonuses of two to three hundred dollars per month. When she inquired concerning her failure to receive a bonus at the end of her first month, however, she was told, "there was no profit and no bonus." Apparently, the pizzeria never turned a profit, because the appellant never received a bonus. Initially, the appellant's primary duties as manager of this new pizzeria involved training kitchen employees. After this initial training program was completed, however, the appellant was to devote her time exclusively to her other managerial duties.

For the first three months of her employment, the appellant worked in the kitchen, training the kitchen staff. For the next three months, the appellant devoted most of her time to her other managerial duties, such as supervision, bookkeeping, and inventory control. In September 1982, however, the appellant was informed that she was to return to the kitchen as a food preparer and counter person, and that she was expected to continue to perform all of her other managerial responsibilities in addition to her new duties in the kitchen. She testified that one of the owners informed her that "the two girls that I had working in the kitchen at that time were too slow [and] that the business was losing money because of it."

When the appellant confronted the co-owners of the pizzeria on October 7, 1982, with her complaints concerning her change in working conditions, she testified that they responded that they could not afford to employ additional kitchen staff, and that if she was dissatisfied with the change, she should do what she felt she had to do. On October 9, 1982, she informed one of the owners that she was quitting. She testified that,

I told him, that I wasn't hired to work in the kitchen. I was hired to be his Manager. I had enough responsibility as being his Manager without having to work the kitchen too. I put in about sixty hours a week working for him and I was responsible for 118 hours of work. When somebody called it was me that ran.

She further testified that, "[h]e just looked up at me and said—let's not talk about it now.... And I never did get to talk to him again." On October 11, 1982, the appellant informed the other owner that she was quitting effective immediately. His response was to leave the premises. The appellant then proceeded to process an incoming shipment, secure the premises, lock the building, and leave at approximately 10:00 a.m. as additional help was not scheduled to arrive until 6:00 p.m.

On November 19, 1982, a deputy with the Department of Employment Security issued a decision disqualifying the appellant from receiving benefits indefinitely because "the claimant left work voluntarily without fault on the part of her employer." On January 12, 1983, an administrative law judge, after hearing the testimony of the appellant and three of her corroborating witnesses, totally ignoring the issue of change in working conditions, held that because the claimant continued to work after two unrelated disputes over salary and vacation pay, "The reason or necessity for the termination of this employer-employee relationship is the result of the sole decision of the claimant and does not involve any fault on the part of the employer...." The De-

partment of Employment Security Board of Review affirmed the administrative law judge's decision on May 23, 1983, adopting his findings in their entirety. On March 14, 1984, the circuit court affirmed the Board of Review's disqualification without discussion.

West Virginia Code § 21A–6–3(1) (Supp. 1984) provides that, "an individual shall be disqualified for benefits ... [f]or the week in which he left his most recent work voluntarily without good cause involving fault on the part of the employer and until the individual returns to covered employment and has been employed in covered employment at least thirty working days." Furthermore, West Virginia Code § 21A–6A–1(12)(G) (Supp.1984), governing extended unemployment compensation benefits, provides that, "An individual shall not be eligible to receive extended benefits with respect to any week of unemployment in his eligibility period if such individual has been disqualified for regular benefits under this chapter because he or she voluntarily left work...."

■ The sole issue in the instant proceeding is whether the change in appellant's working conditions was "good cause involving fault on the part of the employer" under West Virginia Code § 21A–6–3(1) (Supp.1984), justifying her resignation. In the single Syllabus of *Amherst Coal Co. v. Hix,* 128 W.Va. 119, 35 S.E.2d 733 (1945), this Court stated the general rule that, "Customary working conditions not involving deceit or other wrongful conduct on the part of the employer are not a sufficient reason for an employee to leave his most recent work voluntarily...." *See also Parish v. Brown,* 163 So.2d 860, 861–62 (La.App.1964); *Sage Club, Inc. v. Employment Security Commission,* 601 P.2d 1306, 1310 (Wyo.1979); 76 Am.Jur.2d *Unemployment Compensation* § 59, at 956 (1975); 81 C.J.S. *Social Security* § 233, at 464 (1977). Conversely, misrepresentations concerning the terms of employment or substantial unilateral changes in the terms of employment furnish "good cause involving fault on the part of the employer" which justify employee termination of em-

ployment and preclude disqualification from the receipt of unemployment compensation benefits. *See Warburton v. Industrial Commission,* 678 P.2d 1076, 1077 (Colo.Ct.App.1984) (statute); *Davis v. Board of Review,* 125 Ill.App.3d 67, 72, 465 N.E.2d 576, 580 (1984); *Quillen v. Review Board,* 468 N.E.2d 238, 241–42 (Ind.Ct.App. 1984); *Forrest Park Sanitarium v. Miller,* 233 Iowa 1341, 1343, 11 N.W.2d 582, 583 (1943); *Nichols v. Kentucky Unemployment Insurance Commission,* 677 S.W.2d 317, 321 (Ky.Ct.App.1984); *McGinnis v. Moreau,* 149 So.2d 188, 190 (La.Ct.App. 1963); *Smith v. Maine Employment Security Commission,* 456 A.2d 2, 5 (Me. 1983); *Rutten v. Rockie International, Inc.,* 349 N.W.2d 334, 336 (Minn.Ct.App. 1984); *Glionna v. Chizek,* 204 Neb. 37, 41, 281 N.W.2d 220, 223 (1979); *Burke v. Ross,* 53 A.D.2d 946, 946, 385 N.Y.S.2d 416, 417 (1976); Syl., *Krzkston v. Industrial Commission,* 52 Ohio App.2d 109, 368 N.E.2d 74 (1977); *Naylon v. Unemployment Compensation Board of Review,* 477 A.2d 912, 913 (Pa.Commw.Ct.1984); *Cowles Publishing Co. v. Employment Security Department,* 15 Wash.App. 590, 594, 550 P.2d 712, 715–16 (1976).

The types of circumstances justifying employee termination of employment in response to misrepresentations concerning the terms of employment or to substantial unilateral changes in the terms of employment necessarily vary. In *Nichols v. Kentucky Unemployment Insurance Commission,* 677 S.W.2d 318–19, the court described one of the more extreme examples of substantial unilateral changes justifying resignation:

The appellant, Charles H. Nichols, was first employed by the appellee, Sweet Hollow, Inc., sometime in late 1981. At that time, the appellant agreed to work forty hours per week with his principal duties being the performance of carpentry and general maintenance activities. The appellant's starting salary was originally set at $125.00 per week, but upon the receipt of his initial paycheck, he learned that his employer had unilaterally reduced this amount by $25.00. Although he immediately questioned this

alteration, the appellant subsequently accepted the appellee's explanation that no additional funds to pay him were available and continued on in his work without voicing any additional complaints in this regard.

The resignation of one of his coworkers, who had served as night watchman, approximately two or three weeks later, resulted in further modifications in the appellant's employment contract, when he agreed to temporarily assume the responsibilities of that position until a replacement could be found. As a result of this development, he found himself charged with a variety of new duties in addition to those originally assigned to him. These new responsibilities included the clearing of snow from access roads to the appellee's facility, attendance at the appellee's skating rink during the evening hours, and generally being "on-call" twenty-four hours a day, six days per week. This final aspect of the job, in particular, dictated that he actually take up residence on the appellee's premises. Accordingly, the appellee provided him with a one-room structure, which, with the apparent exception of heat, lacked most of the basic amenities. Most notably, the dwelling contained no kitchen facilities other than a hot plate and a coffee maker and was equipped with neither running water nor a bathroom. To make up for these deficiencies, the appellee furnished the appellant with a bucket of drinking water and a "pea can" and between the hours of 9:00 p.m. and 8:00 a.m. allowed him to use showers and restrooms in a spa which was located elsewhere on the property.

No recognition of his acceptance of these additional responsibilities and longer work hours was given by a concomitant increase in his salary of $100.00 per week. Other than the fact that on occasion the appellee gave him some clothing, particularly shirts, and allowed him to take his meals for free at its restaurant whenever that establishment was open for business, he received nothing extra. During a typical week the restaurant was normally open only two days.

Despite the apparent harshness of the new conditions of employment and circumstances in which he has [sic] now expected to live, the appellant continued to work for the appellee until October of 1982. Throughout this ten-month-long period, however, the appellant repeatedly reminded the appellee of the temporary nature of his assumption of the duties of the night watchman and expressed his need to return to the work assignment under which he had originally been hired. When the appellee chose to ignore these communications, the appellant informed its president, Lester Finley, that he could no longer continue to live on the premises and wished to resume his normal forty-hour work week. Finley rejected the proposed return to the original contract for hire and the appellant consequently resigned his employment shortly thereafter.

This type of servitude represents an extreme example of how unilateral changes in working conditions can justify employee termination of employment and will preclude disqualification from the receipt of unemployment compensation benefits.

Substantial qualitative changes in the types of duties performed have also been held to justify employee resignation. For example, in *Martinez v. Industrial Commission*, 657 P.2d 457, 458 (Colo.Ct.App. 1982), the court held that an unemployment compensation claimant, who resigned his position as branch director responsible for the overall supervision and management of a Boys Club branch prior to his imminent transfer to an instructional position, was not disqualified from the receipt of benefits, stating that, "In the new position of gym instructor or shop instructor, he would not have had supervisory or managerial responsibilities. Under these circumstances, the proposed job transfer involved a substantial change in working conditions as a matter of law." Similarly, in *National Aluminum Corp. v. Unemployment Compensation Board of Review*, 59 Pa. Commw. 359, 363, 429 A.2d 1259, 1260–61 (1981), the court held that an unemployment compensation claimant, who had been

hired as an experienced secretary, but whose duties were gradually replaced by clerical functions despite her objections and transfer requests, was not disqualified for leaving her employment, stating that, "[T]he alteration in claimant's duties after her employment in a skilled position, with the attendant loss or diminution of those skills, was compelling cause for her resignation." Finally, in *Warburton v. Industrial Commission*, 678 P.2d at 1077, the court held that even though an unemployment compensation claimant's job title and salary were to remain the same, because her administrative duties were to be reduced and shared with a former subordinate and her supervisory responsibilities were to be cut in half by staff reduction in her department, she was justified in terminating her employment, and was entitled to a full award of benefits.

■ In addition to substantial qualitative changes in the form of responsibility reductions, substantial quantitative increases in responsibilities may also justify employee termination of employment. In *Krzyston v. Industrial Commission*, 52 Ohio App.2d at 111, 368 N.E.2d at 76, the court held that an unemployment compensation claimant's resignation from her position as secretary with the Ohio Industrial Commission after the imposition of additional duties beyond her work capacity, consisting of responsibility for typing 300 permanent partial disability workers' compensation decisions, "does not constitute quitting work without just cause...." Similarly, in *Paige v. Maine Employment Security Commission*, 391 A.2d 321, 324–25 (Me.1978), the court held that an unemployment compensation claimant was entitled to benefits despite her resignation following transfer to another residential facility for retarded adults, where the number of residents she was assigned to supervise increased, where the number of weekends she was to work increased, and where the incidents of violence to which she would be exposed increased. *See also Davis v. Board of Review*, 125 Ill.App.3d at 73, 465 N.E.2d at 580–81 (claimant who was hired to establish preschool program for three to five-year-old children given new responsibilities involving incorporation of aggressive and destructive emotionally disturbed teenagers into the program for normal preschoolers).

■ Substantial changes in working hours may also justify employee resignation. For example, in *Glionna v. Chizek*, 204 Neb. at 41, 281 N.W.2d at 223, where the claimant quit following the gradual increase of her workday from seven to eleven hours, the court noted,

> The trial judge in his memorandum and order found that plaintiff's "workload proved too much for her and she became concerned about her physical and mental well being." As he so aptly put it, "The facts of this case parallel the Greek fable concerning the countryman who killed the goose that laid the golden eggs."

Similarly, in *Wade v. Hurley*, 33 Colo.App. 30, 33, 515 P.2d 491, 492 (1973), the court held that where an unemployment compensation claimant had agreed to work as a cook at Ma's Hash House on Monday through Friday, but because the employer experienced difficulty securing sufficient help, she was soon working almost every Saturday, she was not precluded from the receipt of benefits following her termination of employment, stating that, "While it is true an employer has the prerogative of setting business hours and working schedules in the absence of a specific agreement ... a contract limiting the working hours ... cannot be ignored." Additionally, substantial changes in the time of day when employment services are to be performed may justify employee resignation from employment. For example, in *Forrest Park Sanitarium v. Miller*, 233 Iowa at 1343, 11 N.W.2d at 582–83, the court held that an unemployment compensation claimant's refusal to accept a transfer to night shift in a violent ward of a sanitarium did not disqualify her from receiving benefits, stating that her "declination of a position excepted by her employment agreement and which probably would have endangered her health did not disqualify her for unemployment benefits."

■ Substantial changes or misrepresentations involving the rate of compensation may also justify employee separation from employment. For example, in *Naylon v. Unemployment Compensation Board of Review*, 477 A.2d at 914, the court held that an unemployment compensation claimant, who was unilaterally transferred to a new position at one half his prior commission rate, "demonstrated that his changed employment conditions were unsuitable and constituted necessitous and compelling cause for his voluntary termination." Similarly, in *National Freight, Inc. v. Unemployment Compensation Board of Review*, 34 Pa.Commw. 161, 162, 382 A.2d 1288, 1289 (1978), the court held that a truck driver, who was informed by his employer that it would retain 35% of his gross receipts for tractor trailer rental despite its initial representations that it would retain only 27% of his gross receipts, was eligible for unemployment compensation after he left employment after only one week on the job because of dissatisfaction with his compensation.

■ It is also important to note that, in some instances, employer misrepresentation concerning the terms of employment providing good cause justifying employee termination of employment may manifest itself in a failure to warn the prospective employee concerning hidden working conditions. In *Johnson v. Unemployment Compensation Board of Review*, 69 Pa. Commw. 303, 306, 450 A.2d 1095, 1097 (1982), the court held that an unemployment compensation claimant was not disqualified from receiving benefits even though he had visited the residential juvenile facility at which he was to work as a house parent and had observed an incident of violence involving two residents, stating that:

> That hazardous conditions may be hidden to the untrained eye is obvious in a heavy manufacturing context. Training or experience may also be necessary before an employee can appreciate safety hazards which are involved in a social service job, particularly where it includes working with institutionalized juveniles or convicted persons. Because the record shows

that the claimant had no experience or training for the job, he may not have been able to know what the employment duties or conditions, such as understaffing, meant in terms of his personal safety. The only evidence on that point of claimant's knowledge appears to have been the testimony of the claimant himself ... that he did not know that the job involved using physical force, to restrain juveniles from fighting and to protect himself.

■ It is uncontroverted in the instant proceeding that the appellant was hired as restaurant manager and that, following an initial kitchen staff training program, her duties in this capacity were not to include food preparation and customer service. For the first six months of her employment, the terms of this agreement were observed. As the profitability of this fledgling operation became more uncertain, however, the appellant was informed that her duties were to be expanded to include kitchen responsibilities. Additionally, as in *Nichols*, this expansion of duties was not accompanied by any increase in compensation. The appellant expressed her disapproval of these changes openly and directly, and sought a return to the terms of her initial employment agreement. Rather than attempting to seek a compromise with respect to the appellant's terms of employment, however, her employers sought to avoid the issue.

Recently, in *Lough v. Cole*, 172 W.Va. 730, 310 S.E.2d 491, 495 (1983), this Court held that an employee who left his employment to seek other work because his employer was in the process of going out of business was not disqualified from receiving unemployment compensation benefits for terminating his employment "without good cause involving fault on the part of the employer" under West Virginia Code § 21A–6–3(1) (Supp.1984). Similarly, in the instant proceeding, the appellant cannot be penalized for abandoning a sinking ship and cannot be charged with a duty to heroically accept substantial unilateral changes in the terms of her employment to prevent that ship from sinking. Terms of employ-

**430**

ment are not ballast to be unilaterally thrown overboard when a business begins taking in water. Therefore, the appellant's termination of employment in response to the substantial unilateral changes in the terms of employment discussed did not constitute leaving employment without good cause involving fault on the part of her employer under West Virginia Code § 21A–6–3(1) (Supp.1984), and she should not have been disqualified from receiving unemployment compensation benefits.

For the foregoing reasons, we reverse the judgment of the Circuit Court of Kanawha County which affirmed the final order of the Board of Review, and we remand the case to the Commissioner of the Department of Employment Security with instructions to enter an order awarding the appellant the benefits to which she is entitled in accordance with the principles enunciated in this opinion.

Reversed and remanded with instructions.