664 S.E.2d 714

**Deborah K. MAY, Plaintiff Below, Appellant,**

v.

**CHAIR AND MEMBERS, BOARD OF REVIEW; Commissioner, West Virginia Bureau of Employment Programs; and Mate Creek Security, Incorporated, Employer, Defendants Below, Appellees.**

No. 33703.

Supreme Court of Appeals of West Virginia.

Submitted April 1, 2008.

Decided June 17, 2008.

· Kathryn Reed Bayless, Esq., Bayless Law Firm, PLLC, Princeton, WV, for Appellant.

Charles L. Woody, Esq., Eric E. Kinder, Esq., Jeffrey A. Foster, Esq., Spilman Thomas & Battle, PLLC, Charleston, WV, for Appellees.

PER CURIAM.

The instant action is before this Court upon the appeal of Deborah May [hereinafter "Appellant"] from a January 19, 2007, order entered by the Circuit Court of Kanawha County affirming the Board of Review's final order denying the Appellant's unemployment claim. Herein, the Appellant alleges that because substantial unilateral changes in the terms of her employment instigated by her employer necessitated her resignation, the lower tribunals erred in denying her unemployment claim finding that she had left employment voluntarily without good cause involving fault on the part of the employer. The Appellee alleges that the Appellant was correctly disqualified from receiving unemployment compensation benefits because the facts presented below demonstrate that the Appellant left her job voluntarily without good cause involving fault on the part of the employer after her demands for a raise were refused. This Court has before it the peti-

tion for appeal, all matters of record and the briefs and argument of counsel. For the reasons expressed below, the January 19, 2007, order of the Circuit Court of Kanawha County is reversed and remanded with directions to award the Appellant unemployment compensation benefits.

## I.

## FACTUAL AND PROCEDURAL HISTORY

On May 4, 2001, the Appellant commenced employment with Mate Creek Security [hereinafter "Mate Creek"] working as a personal maid at a three story home owned by Rawl Sales in Sprigg, West Virginia. At the time of hire, the Appellant was assigned the duties of cleaning and maintaining the upkeep of the home, as well as performing personal household tasks for Don Blankenship, who occupied the home. Appellant alleges that at the time of hire, the duties assigned to the Appellant were capable of being performed within a normal eight hour work day, and there was no indication at the time of hire that she would be expected to routinely work overtime hours. In fact, for the first several months that the Appellant worked with Mate Creek, the Appellant worked normal eight hour days.[1]

After performing those duties for approximately 20 months, her employer made changes to her assigned duties. In December 2002, the Appellant was asked to take on the task of cleaning a two-cabin business complex located in Kentucky in addition to maintaining the Sprigg home.[2] There, she took on the additional duties of cleaning and doing laundry for guests, including Mr. Blankenship, who stayed in the cabins. The following June, Mr. Blankenship, with the Appellant's assistance, moved back to the Sprigg home. However, after the move, the Appellant was still required to continue cleaning and maintaining the Kentucky cabin complex. In light of the additional duties she was assigned and the driving that was required to the cabin complex, the Appellant requested a wage increase in July 2003. Appellant's request for a pay raise was denied.

Subsequently, in 2004, Mr. Blankenship asked the Appellant to take on the additional task of cleaning a recently purchased coach bus on a weekly basis. Appellant was also required to stock the bus with various snacks and beverages according to Mr. Blankenship's specifications. Then in January, 2005, the Appellant was assigned to yet another home that she was required to clean and maintain, in addition to her other responsibilities. Despite the significant changes in her duties and the additional tasks she took on, she received no help. She still received no wage increase.

As the Appellant's duties continued to expand, her work hours became longer and she was routinely required to work overtime hours to get all of her tasks completed. Appellant was required to work as many as thirty-three hours of overtime in one given week. Additionally, as her workload increased, it became such that she could not keep everything accomplished to Mr. Blankenship's satisfaction. Appellant eventually became so stressed out that she became sick, and she went to the hospital in October 2005, because she thought she was having a heart attack. The Appellant submitted her resignation to Mate Creek on November 18, 2005, after a final incident occurred wherein Mr. Blankenship advised the Appellant that she would be required to care for a German police dog that was going to be brought into the house.

Upon termination of her employment, the Appellant filed a written claim for unemployment benefits with the West Virginia Bureau of Unemployment Programs, stating:

"I quit my job on 11/18/05 after giving a 2 week notice. I quit because I was not

---

1. After working for Mate Creek for approximately one year, she was given a thirty cent pay raise. The record reflects that the Appellant earned $8.86 an hour.

2. Throughout the time of her employment, the Appellant's assignments were made by Mr. Blankenship directly or by his secretary, Sandra Davis. The Appellant was assigned to work at the Kentucky cabin complex because the maid previously assigned to clean and maintain the complex had been fired.

given a pay raise and over the years my job duties kept increasing. The last pay raise I received was in 2002. During my employment at least 5 times, I asked for pay increases that were denied. The last time I requested a pay raise was approximately 09/05. This was creating stress for me as the cost of living keeps going up. A couple of weeks ago due to stress I went to the doctor. I kept working. My goal was to get a pay raise and to get medical insurance for my daughter. I went to the welfare office to try to get medical coverage for my daughter. I was denied as I made $144.00 to (sic) much per month. Prior to quitting I told Harold Osborne, he is the person employees are to talk to and then he talks to the employer. I told him that I was tired of my job duties increasing and not getting a pay increase. This was on the day I submitted my resignation. He asked me what would they have to do to keep me working. I told him that I required a wage of $12.00 per hour, a company vehicle, and medical insurance for my children. He never responded to my issues. The circumstances causing the quit do not still exist. I am able, available and seeking full-time work. The final incident was my employer was bringing a German police attack dog into the house which I took care of. This would mean more job duties for me without a pay raise."

After reviewing the Appellant's request, on December 5, 2005, the Deputy held the following: "Claimant disqualified from November 13, 2005, to indefinite; left work voluntarily without good cause involving fault on the part of the Employer. Disqualified until Claimant returns to covered employment and has been employed in covered employment at last thirty working days."

Appellant appealed the Deputy's decision to the Board of Review. An evidentiary hearing was held on January 6, 2006, wherein the Appellant testified regarding the various changes in her work duties and presented several exhibits for consideration. On March 1, 2006, the Board of Review affirmed the ruling of the Deputy. The Chief Administrative Law Judge found no fault on the part of the employer, and that the Appellant quit her job "primarily due to the fact that she was asked to take on additional work responsibilities yet did not receive any increase in her salary. She also felt it was difficult to please Mr. Blankenship." However, the Administrative Law Judge made no specific finding of fact as to whether the admitted unilateral changes in the terms and conditions of Appellant's employment were substantial or whether such changes were insubstantial.

The Appellant again appealed the Administrative Law Judge's decision to the Board of Review, which, after reviewing the documents, affirmed and adopted the ruling of the Administrative Law Judge. After a subsequent appeal by the Appellant to the Circuit Court of Kanawha County, the circuit court affirmed the Board of Review's denial of unemployment benefits on January 19, 2007. It is from the circuit court's order that Appellant now appeals.

## II.

### STANDARD OF REVIEW

This Court has previously held that "[t]he findings of fact of the Board of Review of the West Virginia Department of Employment Security are entitled to substantial deference unless a reviewing court believes the findings are clearly wrong. If the question on review is purely one of law, no deference is given and the standard of judicial review by the court is *de novo*" Syl. Pt. 3, *Adkins v. Gatson*, 192 W.Va. 561, 453 S.E.2d 395 (1994). In this case, we apply a *de novo* review to the Board of Review's legal conclusion that the Appellant quit her job "voluntarily without good cause involving fault on the part of the employer" within the meaning of West Virginia Code § 21A–6–3(1) [2005].

## III.

### DISCUSSION

The issue before this Court is whether the Appellant is disqualified from receiving unemployment compensation benefits for voluntarily leaving her job "without good cause involving fault on the part of the employer" under West Virginia Code § 21A–6–3(1).

Based on the record before us, we find that the evidence does not support the Board of Review's conclusion that the Appellant is disqualified from receiving unemployment benefits.

■ We have long recognized that "[s]ubstantial unilateral changes in the terms of employment furnish 'good cause involving fault on the part of the employer' which justify employee termination of employment and preclude disqualification from the receipt of unemployment compensation benefits." Syl. Pt. 2, in part, *Murray v. Rutledge,* 174 W.Va. 423, 327 S.E.2d 403 (1985). The types of circumstances justifying employee termination of employment in response to misrepresentations concerning the terms of employment or to substantial unilateral changes in the terms of the employment necessarily vary. *Id.* at 426, 327 S.E.2d at 406.

In *Murray,* we recognized that "substantial changes in working hours may justify employee resignation." *Id.* at 428, 327 S.E.2d at 408 (citing *Glionna v. Chizek,* 204 Neb. 37, 281 N.W.2d 220, 223 (1979), wherein the court awarded unemployment benefits when a claimant's workload proved too much for her after gradual increase of work hours from seven to eleven hours.) The claimant in *Murray,* who had been employed as a restaurant manager, was required after a few months of employment to begin working in the kitchen in addition to completing her managerial duties. This Court found that the claimant had experienced a significant increase in her duties and her working hours with no increase in compensation. We concluded that a substantial unilateral change in the terms and conditions of employment can constitute good cause justifying resignation. 174 W.Va. at 428, 327 S.E.2d at 408.

We also noted in *Murray* that substantial quantitative increases in responsibilities may also justify employee termination of employment. 174 W.Va. at 428, 327 S.E.2d at 408 (citing *Krzyston v. Industrial Commission,* 52 Ohio App.2d 109, 368 N.E.2d 74, 76 (1977), wherein the court held that an unemployment compensation claimant's resignation from her position as secretary with the Ohio Industrial Commission after the imposition of additional duties beyond her work capacity, consisting of responsibility for typing 300 permanent partial disability workers' compensation decisions "does not constitute quitting work without just cause ..."); (also citing *Paige v. Maine Employment Security Commission,* 391 A.2d 321, 324–25 (Me.1978), wherein the court held that an unemployment compensation claimant was entitled to benefits despite her resignation following transfer to another residential facility for retarded adults, where the number of residents she was assigned to supervise increased, the number of weekends she was to work increased, and where the incidents of violence to which she would be exposed increased.)

■ In the instant case, the Appellant was hired by Mate Creek to provide personal maid services in the home of Mr. Blankenship. For the first twenty months of her employment, the Appellant worked normal eight hour days in one specific location performing the type of services she was hired to complete. As Mr. Blankenship's living arrangements changed, so did the duties of the Appellant. While the scope of services under which the Appellant worked did not necessarily change, the record confirms that her work duties were continuously expanded.

The record before us reveals that at the evidentiary hearing held before the Board of Review, the Appellant submitted various exhibits demonstrating that substantial unilateral quantitative changes in the terms of her employment occurred. The exhibits included, among other things, a payroll slip demonstrating the thirty-three hours of overtime worked within one week. Appellant also submitted a nine page hand-written summary of her duties, and she explained the duties that had been added on to her workload since her original duties were assigned.

Appellant also submitted rather colorful evidence at the evidentiary hearing of Mr. Blankenship's strident behavior which, in addition to the expanding duties she was asked to perform, added to the Appellant's stress. For example, Appellant submitted as an exhibit an explanation letter she was required to write to Mr. Blankenship explaining why

there was no ice cream in the freezer at one of the houses. She pointed out that he did not seem to realize "the magnitude and heavy volume of work that has been put in my lap since I began working here, with only one pay raise in the last four years. Today you have crushed me." She apologized and asked that he tell her if he did not want her to work any longer. Mr. Blankenship sent back a hand-written note acknowledging, among other things, that she was under a lot of stress and that his comments added to her stress.

Appellant told the Board of Review that there was no single thing that caused her to conclude that she could not continue to work under the changed conditions of her employment. She testified that "[i]t's verbal stuff that has went on over the years. It's not just really one big thing. It's just many things. It's added work on top of work, on top of work, on top of work that one person cannot physically do." Mate Creek did not contradict or rebut Appellant's testimony or exhibits, and did not call any witnesses at the evidentiary hearing.

Based upon a review of the uncontroverted evidence in the record, we find that the Appellant did indeed encounter various substantial unilateral quantitative changes in the terms of her employment. Appellant went from the assignment of cleaning one house to cleaning four houses and a coach bus, and it is evident that the quantity of her workload had increased substantially. The Appellant became required to routinely work overtime hours, putting the needs of her employer before the needs of her own family. Despite her regular entreaties to an employer who acknowledged her stress at her increasing duties, her compensation never increased after the first year of work. To the extent that the Board of Review's findings focused solely on the issue of Appellant's request for a pay raise, the Board of Review's decision was clearly wrong. Because the Board of Review ignored the factual evidence regarding the substantial unilateral quantitative changes in her employment and failed to analyze whether the changes were substantial and whether they amount to "good cause", Board of Re-

view's factual findings and legal conclusions were erroneous.

We have traditionally recognized that "[u]nemployment compensation statutes, being remedial in nature, should be liberally construed to achieve the benign purposes intended to the full extent thereof." Syl. Pt. 6, *Davis v. Hix,* 140 W.Va. 398, 84 S.E.2d 404 (1954). Accordingly, given the totality of the specific circumstances before us, we conclude as a matter of law that these quantitative changes were substantial enough to constitute good cause involving fault on the part of the employer to justify the Appellant's termination of employment, and the Appellant should not have been disqualified from receiving unemployment compensation benefits. The Board of Review's conclusion that the Appellant quit her job "voluntarily without good cause involving fault on the part of the employer" is therefore reversed.

### IV.

### CONCLUSION

For these reasons, we reverse the judgement of the Circuit Court of Kanawha County which affirmed the final order of the Board of Review, and we remand the case to the Commissioner of the Department of Employment Security with instructions to enter an order awarding the Appellant the benefits to which she is entitled.

**Reversed and remanded with instructions.**

Chief Justice MAYNARD, deeming himself disqualified, did not participate in the decision of this case.

Justices STARCHER and ALBRIGHT, concur and reserve the right to file concurring opinions.

ALBRIGHT, Justice, and STARCHER, Justice, concurring.

I concur in the majority opinion. I write separately because there are additional grounds for reversing the decision of the Board of Review to disqualify Ms. May from receiving unemployment compensation benefits.

This Court stated in syllabus point 6 of *Slack v. Kanawha County Housing & Redevelopment Authority,* 188 W.Va. 144, 423 S.E.2d 547 (1992):

> In order to prove a constructive discharge, a plaintiff must establish that working conditions created by or known to the employer were so intolerable that a reasonable person would be compelled to quit. It is not necessary, however, that a plaintiff prove that the employer's actions were taken with a specific intent to cause the plaintiff to quit.

In addition to matters discussed in the majority opinion, the unrefuted evidence before the Board of Review showed the following, as recited in the brief of Ms. May, whose duties included performing personal tasks for Mr. Don Blankenship, who occupied the home owned by Rawl Sales:

> On two different occasions, Mr. Blankenship physically grabbed Ms. May. Once, while trying to stock the coach bus after a last minute notice to do so, Mr. Blankenship grabbed her arm, pulled her towards him, and told her to leave the bus. Ms. May found that treatment to be embarrassing since many of Mr. Blankenship's guests were on the bus when the incident occurred. On another occasion, Mr. Blankenship sent her to McDonald's to purchase breakfast for him and his interior decorator. Ms. May placed the order, accepted the food and returned to the Blankenship home. As she unpacked the food, Mr. Blankenship discovered that McDonald's filled the order incorrectly; Mr. Blankenship started slinging the food and he grabbed Ms. May's wrist, telling her "Any time I want you to do exactly what I tell you to do and nothing more and nothing less."

> Mr. Blankenship directed, through his secretary, that Ms. May write him an explanation of why there was no ice cream in the freezer at one of the houses. He believed she was mocking him by failing to purchase the ice cream he wanted. Ms. May did write an explanation on July 11, 2005. She pointed out that he did not seem to realize "the magnitude and heavy volume of work that has been put in my lap since I began working here, with only one $.30 raise in the last four years. Today you have crushed me." She apologized and asked that he tell her if he did not want her to work any longer. Mr. Blankenship sent back a hand-written note acknowledging that she was under a lot of stress and that his comments added to her stress. He acknowledged her financial difficulty and proceeded to advise that she was well paid in comparison to others in West Virginia and Kentucky and explained that folks working for him sometimes decreased his comfort level. In an explanation apparently intended to be critical of the food purchases she had made for the home, he gave an example related to low carb foods.

> On or about July 12, 2005, Ms. May forgot to leave a coat hanger out for Mr. Blankenship to hang his coat. Mr. Blankenship's reaction was to tear the coat hanger and tie rack out of the closet. He left her a note explaining that she would get a call explaining why he tore it out. He wrote her that he "had 3 dogs stolen in 9 days, mines robbed, people complain incessantly, all of them want more money. None of them do what their (sic) asked." Mr. Blankenship's secretary spoke to Ms. May and explained that "he tore the coat hanger and rack and stuff all out . . . that if I had to fix it and repair it and put everything back, it would be a good reminder that I was not to forgot (sic) that hanger in the future.

This shocking conduct directed at Ms. May leaves no doubt that Ms. May's working conditions were "so intolerable that a reasonable person would be compelled to quit." *Slack, supra.* Such conduct by an employer is reminiscent of slavery and is an affront to common decency.

Therefore, Ms. May's termination of employment should be treated as a firing, and her eligibility for unemployment benefits is unquestionable.

I am authorized to state that Justice STARCHER joins in this separate opinion.