663 S.E.2d 583

Gary W. CHILDRESS and Arthur C. Boggs, Petitioners Below, Appellees

v.

Quetta MUZZLE, Acting Commissioner of West Virginia Bureau of Employment Programs; James C. Dillon, Chairman, Board of Review, Bureau of Employment Programs; and Clearon Corp., Respondents Below

Clearon Corp., Appellant.

No. 33440.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 23, 2008.

Decided March 19, 2008.

Bradley J. Pyles, Esq., Robert J. Smith, Esq., Pyles, Haviland, Turner & Smith, Charleston, WV, for Appellee, Arthur C. Boggs.

Christopher L. Slaughter, Esq., Robert L. Bailey, Esq., Steptoe & Johnson, Charleston, WV, for Appellant.

Gary W. Childress, Pro se.

STARCHER, J.

The appellant, Clearon Corp., is appealing a trial court order holding that the appellees, Arthur C. Boggs and Gary W. Childress, were entitled to State unemployment benefits. The trial court order reversed the Board of Review of the West Virginia Bureau of Employment Programs holding that the appellees were disqualified from receiving unemployment compensation benefits. The Board of Review ruling was based upon a finding that the appellees voluntarily quit their jobs when they accepted a Clearon Corp. offer for early retirement benefits.

For the reasons stated, *infra,* we reverse the trial court.

## I.

### *Facts & Background*

The appellant, Clearon Corp. ("Clearon"), is a small chemical manufacturer located in South Charleston, West Virginia. In 2003 Clearon had eighty-eight employees. Prior to their retirement, the appellees, Arthur C. Boggs and Gary W. Childress, had been employed by Clearon since 1995.

In October 2003, in order for Clearon to remain competitive as a chemical manufacturer, Clearon determined that it needed to reduce costs. Rather than laying off employees, Clearon decided to offer a voluntary early retirement package to employees who were at least fifty-five years old and had at least ten years of service with Clearon, or in combination with Clearon and its predecessor corporations. Of Clearon's eighty-eight employees, fifty-seven were eligible for the early retirement package. And of the fifty-seven eligible employees, twenty-nine, including the appellees, accepted Clearon's offer. As a result of their acceptance of Clearon's offer, both Boggs and Childress terminated their employment on November 30, 2003.[1]

The early retirement package accepted by the appellees included a cash bonus of $16,000.00 and pension incentives in which Clearon agreed to waive certain penalty reductions in retirement benefits for those persons accepting the early retirement package. A four percent reduction penalty was waived with respect to appellee, Childress's pension and a twenty-eight percent reduction penalty was waived with respect to appellee, Bogg's pension. Clearon's retirement plan also had a Social Security offset provision which was waived by Clearon. The record is not clear with respect to whether or not the Social Security offset provisions benefitted the appellees.

---

1. At the time of his retirement, appellee, Arthur C. Boggs, was fifty-five years old and was being paid $22.60 per hour.

At the time of his retirement, appellee, Gary W. Childress, was sixty-one years old and was being paid $21.00 per hour.

Because of the large number of employees accepting the early retirement package, Clearon never faced having to lay off any employees.

After the appellees left their employment with Clearon, both appellees applied to the West Virginia Bureau of Employment Programs ("BEP") for unemployment compensation benefits.

On March 5, 2004, a BEP deputy determined that appellee, Gary W. Childress, was eligible for unemployment compensation benefits. On March 17, 2004, a BEP deputy determined that the appellee, Arthur C. Boggs, was eligible for unemployment compensation benefits. The BEP deputy decision was then appealed by the appellant, Clearon, and on April 7, 2004, an evidentiary hearing was conducted by an administrative law judge with respect to both appellees. On April 21, 2004, the administrative law judge entered his decision reversing the BEP deputy decision and found that the appellees were not entitled to unemployment compensation benefits. Subsequently the appellees appealed the decision of the administrative law judge to the Board of Review of the West Virginia Bureau of Employment Programs ("BOR"), and on June 8, 2004, the BOR conducted a hearing on the appeal. On June 9, 2004, the BOR entered orders affirming the decision of the administrative law judge denying the appellees unemployment compensation benefits.

On July 7, 2004, the appellees appealed the BOR decision to the Kanawha County Circuit Court. On August 3, 2004, Arthur Boggs and Gary Childress filed a motion in the trial court to consolidate their cases, and the cases were consolidated by an order of the trial court entered on November 12, 2004. On November 3, 2006, the trial court entered an order reversing the BOR decision and ordered that the appellee, Arthur C. Boggs, was eligible for unemployment compensation benefits, and on November 9, 2006, the trial court entered an order reversing the BOR decision and ordered that the appellee, Gary W. Childress, was eligible for unemployment compensation benefits. With the exception of the names and dates both trial court orders were the same.

It is from the circuit court orders dated November 3, 2006 and November 9, 2006, that Clearon appeals.

## II.

### *Standard of Review*

■ In Syllabus Point 3 of *Adkins v. Gatson*, 192 W.Va. 561, 453 S.E.2d 395 (1994) this Court held:

The findings of fact of the Board of Review of the West Virginia Department of Employment Security are entitled to substantial deference unless a reviewing court believes the findings are clearly wrong. If the question on review is one purely of law, no deference is given and the standard of judicial review by the court is *de novo*.

With these principles in mind we proceed to consider the appellant's appeal.

## III.

### *Discussion*

*W.Va.Code*, 21A–1–1 [1978] sets forth the legislative purpose of the Unemployment Compensation Law ("Act") as follows:

The purpose of this chapter is to provide reasonable and effective means for the promotion of social and economic security by reducing as far as practicable the hazards of unemployment. In the furtherance of this objective, the Legislature establishes a compulsory system of unemployment reserves in order to:

(1) Provide a measure of security to the families of unemployed persons.

(2) Guard against the menace to health, morals and welfare arising from unemployment.

(3) Maintain as great purchasing power as possible, with a view to sustaining the economic system during periods of economic depression.

(4) Stimulate stability of employment as a requisite of social and economic security.

(5) Allay and prevent the debilitating consequences of poor relief assistance.

While we have held that "[u]nemployment compensation statutes, being remedial in nature, should be liberally construed to achieve the benign purposes intended to the full extent thereof" (*See* Syllabus Point 6 of *Davis v. Hix*, 140 W.Va. 398, 84 S.E.2d 404 (1954)), we believe that it is also important for the Court to protect the unemployment compensation fund [2] against claims by those not entitled to the benefits of the Act. Also, we believe that the basic policy and purpose of the Act is advanced both when benefits are denied to those for whom the Act is not intended to benefit, as well as when benefits are awarded in proper cases. Additionally, we believe that the Act was clearly designed to serve not only the interest of qualifying unemployed persons, but also the general public.[3]

The unemployment compensation program is an insurance program, and not an entitlement program, and is designed to provide "a measure of security to the families of unemployed persons"[4] who become involuntarily unemployed through no fault of their own. "The [Act] is not intended, however, to apply to those who 'willfully contributed to the cause of their own unemployment.'" *See Hill v. Board of Review*, 166 W.Va. 648, 651, 276 S.E.2d 805, 807 (1981) (quoting *Board of Review v. Hix*, 126 W.Va. 538, 541, 29 S.E.2d 618, 619 (1944)). From our reading of the Act, we believe the obligation of employees under the Act is to do whatever is reasonable and necessary to remain employed.

These basic principles have long been observed by this Court. In *State v. Hix*, 132 W.Va. 516, 523, 524, 54 S.E.2d 198, 201, 202 (1949), this Court stated:

... We think it fair to assume that the purpose of the Unemployment Act of 1936 was to encourage employment, because upon employment and the wages paid to employees depends the solvency of the fund built up for the protection of employees against the risks of unemployment. Any interpretation of the act, which encourages people not to work, can scarcely be considered as having been within the intent of the Legislature or of the proponents of the unemployment compensation system. . . .

The operative statutory provision of the Act which applies in the instant case is *W.Va. Code*, 21A–6–3(1) [2005][5] which states, in relevant part, as follows:

**Disqualification for benefits.** Upon the determination of the facts by the Commissioner, an individual shall be disqualified for benefits:

(1) For the week in which he or she left his or her most recent work voluntarily without good cause involving fault on the part of the employer and until the individual returns to covered employment and has been employed in covered employment at least thirty working days.

This Court in *Gibson v. Rutledge*, 171 W.Va. 164, 166, 298 S.E.2d 137, 139 (1982), a case involving the application of *W.Va.Code*, 21A–6–3, observed that most states have disqualifying provisions in their unemployment compensation law which are similar to *W.Va. Code*, 21A–6–3. In Gibson, in discussing the purpose of such disqualifying provisions, we stated that:

... one of the primary purposes of the West Virginia Unemployment Compensation Act, ... is to compensate individuals who are involuntarily unemployed. *W.Va. Code*, 21A–6–3(1) is included in the Act to disqualify those employees who are voluntarily unemployed and who therefore should not be entitled to the same benefits and treatment as involuntarily unemployed individuals.

*Gibson v. Rutledge*, 171 W.Va. at 166, 298 S.E.2d at 140 (citations omitted).

The applicable portion of *W.Va.Code*, 21A–6–3(1), under which the trial court found that the appellees were entitled to unemployment benefits includes the word, "voluntari-

---

**2.** *See W.Va.Code*, 21A–8–1 et seq. [1985].

**3.** *W.Va.Code*, 21A–1–1(2), (3) and (4).

**4.** *See W.Va.Code*, 21A–1–1(1).

**5.** *W.Va.Code*, 21A–6–3 was amended by the Legislature in 1990 and again in 2005; however, the relevant language of the statute applicable to the instant case was not changed by the 2005 amendment.

ly," and the instant case rests, in part, upon the proper application and meaning of this word. While the word "voluntary" is not defined in the Act, this Court has had occasion to discuss its meaning. In *State v. Hix*, 132 W.Va. 516, 522, 54 S.E.2d 198, 201 (1949) we concluded that "voluntarily" means "the free exercise of the will." From an examination of the statute and cases decided in this and other jurisdictions, we believe that this definition satisfies the legislative intent of the Act. Therefore, we hold that the word voluntarily as used in *W.Va.Code*, 21A–6–3(1) means the free exercise of the will.

In this case the Court must also consider what is a proper application of the term "good cause." In applying *W.Va.Code*, 21A–6–3(1) a court must differentiate between an individual who voluntarily quits work with good cause involving fault on the part of the employer and an individual who quits work "voluntarily without good cause involving fault on the part of the employer." (Emphasis added.) Just as "voluntarily" is not defined in the Act, neither is the term "good cause" defined in the Act, *W.Va.Code*, 21A–1–1 *et seq.*

We do not find any West Virginia case that discusses "good cause" in the context of early retirement incentive packages. However, the case *of Brady v. Board of Review*, 152 N.J. 197, 704 A.2d 547 (1997), a case that does involve an early retirement incentive package is instructive on the term "good cause" as it relates to our case. In *Brady* the New Jersey court said that the term "good cause" was likewise not defined in their statutes, but acknowledged prior holdings of the court that found the term "good cause" to mean "cause sufficient to justify an employee's voluntarily leaving the ranks of the employed and joining the ranks of the unemployed." *Brady, supra*, 152 N.J. at 214, 704 A.2d at 556.

*Brady* went on went on to explain:

... The test of "ordinary common sense and prudence" must be utilized to determine whether an employee's decision to leave work constitutes good cause. Such cause "must be compelled by real, substan-

tial and reasonable circumstances not imaginary, trifling and whimsical ones." A claimant has the "responsibility to do whatever is necessary and reasonable in order to remain employed."

*Brady, supra*, 152 N.J. at 214, 704 A.2d at 556 (citations omitted).

*Brady* applied a two-part test to determine whether or not a claimant can satisfy the good cause requirement under the New Jersey statute. Under *Brady*, when a claimant accepts a retirement incentive package, the claimant is disqualified for unemployment benefits unless the claimant can

... establish by "definitive objective facts," (1) a well-grounded fear of "imminent layoff" and (2) that they "would suffer a substantial loss by not accepting early retirement."

*Brady, supra*, 152 N.J. at 222, 704 A.2d at 560. *See also In re N.J.A.C. 12:17–9.6 ex rel State Dept. of Labor*, 395 N.J.Super. 394, 400, 928 A.2d 956, 959 (2007).

 We believe that the definition of good cause and the two-part test as discussed in *Brady* are compatible with our West Virginia Unemployment Compensation Law. Accordingly, we hold that the term "good cause" as used in *W.Va.Code*, 21A–6–3(1) means cause involving fault on the part of the employer sufficient to justify an employee's voluntarily leaving the ranks of the employed and joining the ranks of the unemployed. We further hold that under *W.Va.Code*, 21A–6–3(1) individuals who accept an early retirement incentive package are disqualified from receiving unemployment compensation benefits unless they (1) establish a well-grounded fear of imminent layoff supported by definitive objective facts involving fault on the part of the employer and (2) establish that they would suffer a substantial loss by not accepting the early retirement incentive package.

On April 10, 2002, the BEP issued a department memorandum that provided the BEP staff guidance with interpreting *W.Va. Code*, 21A–6–3, as it relates to employer initiated voluntary separations. The appellees argue that this BEP's April 10, 2002 Local Office Letter 2200 [6] applies to the circumstances of this case and qualifies the appel-

---

**6.** Following is the complete text of the West Virginia Bureau of Employment Programs Local

Office Letter 2200, dated April 10, 2002:

lees for unemployment compensation benefits under *W.Va.Code*, 21A–6–3.

■ When this Court is required to review an interpretation of a statute by a state agency, we have held that: "[i]nterpretations of statutes by bodies charged with their administration are given great weight unless clearly erroneous." *See* Syllabus Point 4 of *Security Nat. Bank & Trust Co. v. First W. Va. Bancorp., Inc.*, 166 W.Va. 775, 277 S.E.2d 613 (1981). *See also* Syllabus Point 4 of *State ex rel. ACF Industries, Inc. v. Vieweg*, 204 W.Va. 525, 514 S.E.2d 176 (1999) .and *Martin v. Randolph County Board of Education*, 195 W.Va. 297, 465 S.E.2d 399 (1995).

■ Notwithstanding this general rule of statutory construction, however, we held in Syllabus Point 5 of *Hodge v. Ginsberg*, 172 W.Va. 17, 303 S.E.2d 245 (1983) that:

> While the interpretation of a statute by the agency charged with its administration should ordinarily be afforded deference, when that interpretation is unduly restrictive and in conflict with the legislative intent, the agency's interpretation is inapplicable.

Applying these principles, we first determine whether or not Local Office Letter 2200 is consistent with *W.Va.Code*, 21A–6–3.

TO: Claims Offices and UC Supervisory Personnel
FROM: Daniel Light, Director of Unemployment Compensation
SUBJECT: Employer–Initiated Voluntary Separations

Due to a recent legal opinion, a new policy is being established to address situations where an employer initiates a separation by providing employees with the option of voluntarily leaving their employ when layoffs become necessary. An employee shall not be disqualified in situations where an employer notifies employees that some employees will be laid off, and allows the employees to take mutually agreed upon election rather than involuntary selection. A claimant who volunteers for a layoff shall not be disqualified from receiving benefits if the employer has an established workforce reduction plan that allows the employee to volunteer to be laid off due to a lack of work situation, and the claimant's separation actually resulted from a lack of work. The employer becomes the moving party when they offer the voluntary election package. For example, an employer has to reduce the number of employees due to downsizing and, therefore, offers workers having seniority the option to accept layoff ahead of more recently hired individuals who normally would be separated first. Regardless of the employer's reason for permitting a worker to elect to be laid off, the worker who does elect to be laid off has *not* left work voluntarily. This is true even though work may still have been available to that individual if the option to be laid off has not been taken. Such action was, however, with good cause involving fault on the part of the employer, since the employer was in the process of downsizing and offered employees an incentive to leave voluntarily.

Previously, it has been our policy to deny these individuals under West Virginia Code § 21A–6–3, which provides, "Upon the determination of the facts by the commissioner, an individual shall be disqualified for benefits: (1)

for the week in which he left his most recent work voluntarily without good cause involving fault on the part of the employer and until the individual returns to covered employment and has been employed in covered employment at least thirty days."

Effective immediately, after the appropriate fact finding, individuals who are determined to have elected to leave employment under these conditions will be considered to have left work voluntarily with good cause involving fault on the part of the employer. If otherwise qualified for unemployment compensation benefits, they would not be disqualified under the above-mentioned section of Law. The decision should state that the claimant left work voluntarily, with good cause, involving fault on the part of the employer since the employer was the moving party in the separation and under § 21A–6–3(1), no disqualification can be imposed.

This new policy applies only to individuals separated as a result of an employer initiated workforce reduction plan. It does not affect situations where the employer did not initiate the separation and individuals leave their employment while continuing work is still available to them. Example: A company announces its intention to lay off employees. However, the employer has no layoff plan in place and does not offer employees the choice of who will be laid off. Several employees approach the employer and ask to be laid off. As a result of requesting to be laid off, they are separated from employment. Since the claimants initiated the request for layoff, they are the moving party in this scenario and, thus would be disqualified under the above section of law.

Revisions relating to this change in procedure will be incorporated into the *West Virginia Claims Manual* and *Policy and Precedent Manual* at a later date. If there are any questions regarding the changes in procedure, please contact UC Benefits & Technical Support (Mail Code 5106) or telephone 558-3309.

Local Office Letter 2200, written in 2002, was an attempt to interpret *W.Va.Code*, 21A–6–3 in situations where an employer offers employees early retirement incentives "when layoffs become necessary." We find Letter 2200 to be instructive where it states:

> An employee shall not be disqualified [from receiving unemployment benefits] in situations where an employer notifies employees that some employees will be laid off, and allows the employees to take a mutually agreed upon election *rather than involuntary selection*. A claimant who volunteers for a layoff shall not be disqualified from receiving benefits if the employer has an established workforce reduction plan that allows the employee to volunteer to be laid off due to a *lack of work* situation, and the claimant's separation actually resulted from a *lack of work*.

. . .

(Emphasis added.)

Further insight for purposes of interpretation of Local Office Letter 2200 is found in the opinion of the administrative law judge in the instant case where the judge states:

. . .

> . . . Under Local Office Letter 2200 an individual is not disqualified where an employer notifies employees that layoffs are going to occur and allows employees to elect to take an early retirement rather than the prospect of a layoff. The key element is a nexus between an announced layoff and the early retirement option. The employer must have in place a plan of layoff in which the workforce will be reduced.

The evidence in this case does not establish the existence of the elements required by Local Office Letter 2200 to support a finding of no disqualification. There is evidence that a layoff plan was in existence when the claimant [appellees] exercised the option to retire early but because of his seniority, the claimant [appellants] would not have been laid off by the employer.

Instead, the evidence establishes that the claimant could have continued to have worked for the employer in the same job and under the same terms and conditions which were in existence prior to the claimant [appellees] accepting the early retirement package. Therefore, because the claimant would not have been laid off by the employer at the time of the claimant [appellees] accepted the early retirement package, Local Office Letter 2200 would not be applicable.

. . .

Based on the above, we believe the intention of Local Office Letter 2200 was to allow benefits to employees who were faced with the choice of accepting a company offer of early retirement incentives or being subjected to the prospect of being laid off from employment under a specific workforce reduction plan. We further believe that the Letter was intended to deny benefits to those who elect to accept an early retirement package when the affected employee would not have been laid off under the workforce reduction plan. Furthermore, we believe that the interpretation of Local Office Letter 2200 by the appellees is contrary to the intention of the Legislature and the purposes of the Act.[7]

Finally, we observe that whether a particular state permits an award of unemployment compensation benefits to an employee electing to accept an early retirement incentive plan depends on the laws of that state. Consistent with our interpretation of *W.Va.Code*, 21A–6–3 and Local Office Letter 2200, many states have adopted similar results. *See Davila v. Unemployment Compensation Bd. of Review*, 926 A.2d 1287 (Pa.Cmwlth., 2007) (holding that a claimant accepting a deferred retirement option plan when she was not threatened with a loss of her job was not entitled to benefits); *In re N.J.A.C. 12:17–9.6 ex rel State Dept. of Labor*, 395 N.J.Super. 394, 928 A.2d 956 (2007) (holding that a regulation providing unemployment benefits

---

7. We feel compelled to say that we find the language of Local Office Letter 2200 to be confusing and somewhat contradictory. Since a reduction in force is not an uncommon event in today's employment climate, the commissioner may find it helpful to address and, perhaps, update the language of Local Office Letter 2200.

for employees leaving employment pursuant to an early retirement incentive package in order to allow co-workers to retain their jobs was in contravention of the New Jersey Act); *In re Scism*, 27 A.D.3d 938, 811 N.Y.S.2d 479 (2006) (holding that an employee accepting early retirement incentives when she knew her job was not in jeopardy was not entitled to unemployment benefits); *In re Felice*, 24 A.D.3d 992, 805 N.Y.S.2d 487 (2005) (holding that a claimant who voluntarily accepted early retirement incentive package with the knowledge that her job was not threatened was not entitled to unemployment benefits); *In re Fontaine*, 239 A.D.2d 641, 657 N.Y.S.2d 216 (1997) (finding that claimant who accepted early retirement incentive from the Air Force in face of downsizing, but who was never told her position would be abolished, had voluntarily left her employment without cause); *Kehoe v. Minnesota Dept. Of Economic Sec.*, 568 N.W.2d 889 (Minn.App., 1997) (holding that employee who terminated employment to take advantage of early retirement incentive program did not quit with good cause attributable to employer); *Staub v. Unemployment Compensation Bd. of Review*, 673 A.2d 434 (Pa.Cmwlth., 1996) (denying unemployment benefits to a claimant because continuing work was available had he not accepted early retirement); *Uniroyal Goodrich Tire Co. v. Oklahoma Employment Sec. Com'n*, 913 P.2d 1377 (Okl.App.1996) (holding that the claimant was not entitled to unemployment benefits upon his voluntary acceptance of employer's offer of enhanced early retirement benefits); *Matter of Astrom*, 362 So.2d 312 (Fla.App., 1978) (reasoning that although claimant's election of early retirement was reasonable in light of the impending close of operations, the employer never ascertained the date that employees would be terminated and work was available at the time the claimants elected to accept the benefits offered for early retirement).

In the instant case the appellees' jobs were not threatened by Clearon's plan to reduce costs. If the appellees had not accepted the early retirement incentive package offered by Clearon, the appellees could have remained working for Clearon under the same or similar terms and conditions under which they were working at the time they accepted the early retirement incentive package.[8] We see little difference in the appellees' position in this case and that of *Philyaw v. Gatson*, 195 W.Va. 474, 466 S.E.2d 133 (1995) where the claimant had the opportunity to choose between terminating her employment or continuing to work in her job. In *Philyaw* this Court held that the claimant's decision to terminate employment when she had the option to continue to work constituted leaving work "voluntarily without good cause involving fault on the part of the employer."

■ Because the appellees' jobs were not threatened at the time of their acceptance of the early retirement incentive package they are unable to establish a well-grounded fear of imminent layoff supported by definitive objective facts involving fault on the part of the employer. The mere fact that Clearon was attempting to cut costs in the face of competition is insufficient, standing alone, to satisfy this aspect of their claim. For the foregoing reasons we find this aspect of the appellees' claim without merit.

Finally, the appellees assert that Clearon made changes to the appellees' retirement plan, vacation policy, disability policy and workers compensation which constituted good cause under *Wolford v. Gatson*, 182 W.Va. 674, 391 S.E.2d 364 (1990) and *Murray v. Rutledge*, 174 W.Va. 423, 327 S.E.2d 403 (1985). Syllabus Point 2 of *Murray*, in part, states:

[S]ubstantial unilateral changes in the terms of employment furnish "good cause involving fault on the part of the employ-

---

8. That the appellees' jobs were not threatened is supported by the testimony of Clearon's human resource manager, Bill Konopasek, as follows:
 Now our contention is, from what I'm looking at is, should they had not taken the early retirement, they would never have been laid off anyway. Mr. Childress is the number one oldest employee in the whole plant, and Mr. Boggs is, I think number five.

Further supporting a finding that the appellees would not have lost their jobs is the testimony of appellee, Arthur C. Boggs, as follows:
 . . . I didn't think I would have lost my job.
 If I lost mine, Like Bill [Konopasek] said, everyone probably would have lost theirs too. There was never a threat that they were going to. . . .

er" which justify employee termination of employment and preclude disqualification from the receipt of unemployment compensation benefits.

The appellees apparently rely upon copies of a visual presentation used at an employee meeting in which Clearon's cost reduction plans were discussed. No record of the meeting was introduced as evidence. Furthermore, it is not clear from the record whether the changes discussed at the employee meeting were ever actually made or whether the matters discussed were simply potential changes which could occur if an insufficient number of employees did not accept the early retirement incentive package. Also, the record contains no documentation of the impact of the matters discussed upon the appellees—financial or otherwise.

We observe that the trial court made certain findings of fact[9] regarding Clearon's representation to its employees. The trial court did not, however, make any findings indicating that the findings of fact of the Board of Review of the West Virginia Bureau of Employment Programs were clearly wrong. The June 9, 2004 orders of the BOR affirmed the administrative law judge's decision in both cases and included the following:

> The Board of Review, having reviewed all documents in this matter, finds the Administrative Law Judge has made a proper ruling and adopts the finding of the Judge, by reference in its entirety.

The administrative law judge's decision contained the following finding:

> If the claimant had not accepted the voluntary separation program offered by the employer, the claimant could have remained working as an employee for the employer at a similar rate of pay, benefits and responsibilities and other terms and conditions of employment previously enjoyed as an employee.

This finding by the administrative law judge was adopted by the BOR, and was not addressed by the trial court, but rather was left undisturbed.

■■■ We therefore find no support in the record for the appellees' contention that Clearon had made *substantial* unilateral changes in the terms of appellees' employment such that we can conclude that good cause involving fault on the part of the employer existed which justified the appellees terminating their employment. Accordingly, we conclude that this aspect of the appellees' argument is without merit.

## IV.

### *Conclusion*

Based on the foregoing we conclude that under *W.Va.Code,* 21A–6–3(1) and West Virginia Bureau of Employment Programs Local Office Letter 2200, individuals who leave their employment to accept voluntary retirement incentive packages when their jobs are not threatened are disqualified for unemployment compensation benefits unless they (1) establish a well-grounded fear of imminent layoff supported by definitive objective facts involving fault on the part of the employer and (2) establish that they would suffer a substantial loss by not accepting the early retirement incentive package.

In the instant case the record does not support a finding that the appellees' jobs were threatened, nor does it support a finding that they would have suffered a substantial loss if they remained employed by Clearon.

Accordingly, the decision of the trial court is reversed and the Board of Review of the West Virginia Bureau of Employment Programs decision is reinstated.

Reversed.

---

9. The trial court made the following finding:

> In order to reduce the number of employees, the employer initiated an early retirement income plan. The plan provided for enhanced retirement benefits. It included a lump-sum payment and removal of the early retirement reduction penalty. In addition, the employer

announced the outsourcing of substantial work in the maintenance department. Vacation plans were altered, the employer's match to the 401–k plan was suspended, bank days for 2004 were eliminated, holiday carryover was eliminated and changes were made to the disability policy. . . .