IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2018 Term

No. 17-0288

FILED
**March 13, 2018**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

VERIZON SERVICES CORP.,
Petitioner Below, Petitioner,

v.

BOARD OF REVIEW OF WORKFORCE WEST VIRGINIA;
JACK CANFIELD, CHAIRMAN, LESLIE R. FACEMEYER, MEMBER,
AND GINO COLOMBO, MEMBER; RUSSELL L. FRY, EXECUTIVE
DIRECTOR OF WORKFORCE WEST VIRGINIA; AND
JASON E. ALLMAN, ET AL., CLAIMANTS,
Respondents Below, Respondents.

Appeal from the Circuit Court of Kanawha County
Honorable Tod J. Kaufman, Judge
Civil Action No. 16-AA-96

REVERSED AND REMANDED WITH DIRECTIONS

Submitted: January 23, 2018
Filed: March 13, 2018

Mark H. Dellinger, Esq.
Jessie F. Reckart, Esq.
Bowles Rice LLP
Charleston, West Virginia
Attorneys for Petitioner

Vincent Trivelli, Esq.
The Law Office of Vincent Trivelli, PLLC
Morgantown, West Virginia
Attorney for Respondent Claimants

JUSTICE LOUGHRY delivered the Opinion of the Court.

JUSTICE WALKER, deeming herself disqualified, did not participate in the decision in this case.

JUDGE JOSEPH K. REEDER, sitting by temporary assignment.

SYLLABUS BY THE COURT

1.     "The findings of fact of the Board of Review of [WorkForce West Virginia] are entitled to substantial deference unless a reviewing court believes the findings are clearly wrong.  If the question on review is one purely of law, no deference is given and the standard of judicial review by the court is *de novo*."  Syl. Pt. 3, *Adkins v. Gatson*, 192 W.Va. 561, 453 S.E.2d 395 (1994).

2.     "The term 'stoppage of work', within the meaning of the unemployment compensation statutes of this state, refers to the employer's operations rather than to a mere cessation of employment by claimants of benefits under the provisions of such statutes; and, in order that employees may be disqualified from receiving unemployment compensation benefits because of 'a stoppage of work' resulting from a labor dispute, it must appear that there has resulted a substantial curtailment of the employer's normal operations."  Syl. Pt. 2, *Cumberland & Allegheny Gas Co. v. Hatcher*, 147 W.Va. 630, 130 S.E.2d 115 (1963), *overruled on other grounds by Lee-Norse Co. v. Rutledge*, 170 W.Va. 162, 291 S.E.2d 477 (1982).

3.    "Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation." Syl. Pt. 2, *State v. Elder*, 152 W.Va. 571, 165 S.E.2d 108 (1968).

4.    "A cardinal rule of statutory construction is that significance and effect must, if possible, be given to every section, clause, word or part of the statute." Syl. Pt. 3, *Meadows v. Wal-Mart Stores, Inc.*, 207 W.Va. 203, 530 S.E.2d 676 (1999).

5.    "Each word of a statute should be given some effect and a statute must be construed in accordance with the import of its language. Undefined words and terms used in a legislative enactment will be given their common, ordinary and accepted meaning." Syl. Pt. 6, in part, *State ex rel. Cohen v. Manchin*, 175 W.Va. 525, 336 S.E.2d 171 (1984).

6.    The phrase "factory, establishment or other premises at which he or she was last employed" in West Virginia Code § 21A-6-3(4) (2012) means the distinct geographical location where the claimant was last employed prior to the labor dispute.

LOUGHRY, Justice:

The petitioner, Verizon Services Corp. ("Verizon"), appeals the February 22, 2017, final order of the Circuit Court of Kanawha County affirming a decision of the respondent, the Board of Review of Workforce West Virginia ("Board"), that granted twenty-five Verizon employees, respondents herein ("the claimants"[1]), unemployment compensation benefits for a period of time during which they were on strike. In this appeal, Verizon argues that the lower tribunals erred by not finding that a "stoppage of work" occurred at its Clarksburg facility during the strike which disqualified the claimants for unemployment compensation benefits pursuant to West Virginia Code § 21A-6-3(4) (2012).[2] Alternatively, Verizon argues that the lower tribunals erred by not making individualized determinations regarding whether each claimant was disqualified for unemployment compensation benefits under West Virginia Code §§ 21A-6-3(1) and 21A-6-3(3).[3]

---

[1]The claimants have only been identified as "Jason E. Allman and others."

[2]We apply the version of the statute in effect at the time of the strike, the relevant language of which is set forth in section III, *infra*. In 2017, the Legislature amended West Virginia Code § 21A-6-3(4) to disqualify an individual from receiving unemployment compensation benefits for any week "in which he or she did not work as a result of . . . [a] strike or other bona fide labor dispute which caused him or her to leave or lose his or her employment." The amendment became effective on July 2, 2017.

[3]Under West Virginia Code § 21A-6-3(1) (2012), an individual is disqualified for unemployment compensation benefits "[f]or the week in which he or she left his or her most recent work voluntarily without good cause involving fault on the part of the employer[.]" West Virginia Code § 21A-6-3(3) (2012) disqualifies an individual for unemployment compensation benefits "[f]or the week in which he or she failed without good cause to apply

1

Having considered the parties' briefs and arguments, the submitted appendix record, and the applicable authorities, we find that the claimants were disqualified for unemployment compensation benefits under West Virginia Code § 21A-6-3(4). Accordingly, we reverse the circuit court's order and remand this case for entry of an order denying the claimants' applications for unemployment compensation benefits.

## I. Factual and Procedural Background

Verizon operates a call center in Clarksburg, West Virginia, through which it provides sales and services to customers of Verizon Communications, Inc. ("VCI") who live in other states.[4] In the spring of 2016, Verizon experienced a nationwide strike of its union employees. During the strike, the Clarksburg facility was closed.[5] The calls that would have normally been answered by the Clarksburg call center were automatically rerouted to Verizon

---

for available, suitable work, accept suitable work when offered, or return to his or her customary self-employment when directed to do so by the commissioner[.]" These subsections of West Virginia Code § 21A-6-3 were not altered by the 2017 amendment except for a stylistic change to the second paragraph of subsection (1). *See* W.Va. Code § 21A-6-3 (2017).

[4]According to Verizon, VCI sold its West Virginia landline operations to Frontier Communications several years ago and, therefore, does not have any West Virginia customers.

[5]At the time of the strike, thirty people were employed at the Clarksburg facility, three of whom were managers. Two employees, who were union members, were on short-term disability during the relevant time period and, therefore, did not seek unemployment compensation benefits. The other twenty-five employees participated in the strike and are the claimants in this case.

2

call centers in other states. The claimants performed no work and did not receive any wages during the strike, which lasted from April 13, 2016, to May 21, 2016. They sought unemployment compensation benefits for this time period by filing applications with the Board.

Verizon opposed the claimants' applications for unemployment compensation benefits. The matter was assigned to a labor dispute tribunal of the Board. Following an evidentiary hearing, the labor dispute tribunal ruled that the claimants were not disqualified from receiving unemployment compensation benefits. After the decision was affirmed by the Board, Verizon appealed the ruling to the circuit court. By order entered February 22, 2017, the circuit court affirmed the Board's decision. This appeal followed.

## II. Standard of Review

Our standard of review is set forth in syllabus point three of *Adkins v. Gatson*, 192 W.Va. 561, 453 S.E.2d 395 (1994), as follows:

> The findings of fact of the Board of Review of [WorkForce West Virginia] are entitled to substantial deference unless a reviewing court believes the findings are clearly wrong. If the question on review is one purely of law, no deference is given and the standard of judicial review by the court is *de novo*.

In considering the issue presented, we are also mindful of the fact that "the burden of persuasion is upon the former employer to demonstrate by the preponderance of the evidence

3

that the claimant's conduct falls within a disqualifying provision of the unemployment compensation statute." *Peery v. Rutledge*, 177 W.Va. 548, 552, 355 S.E.2d 41, 45 (1987). Guided by these precepts, we consider the parties' arguments.

## III. Discussion

Whether the claimants were entitled to collect unemployment compensation benefits while on strike in 2016 is governed by West Virginia Code § 21A-6-3 (2012).[6] With regard to a strike or labor dispute, the statute provided, in pertinent part:

> Upon the determination of the facts by the commissioner, an individual is disqualified for benefits:
>
> . . . .
>
> (4) For a week in which his or her total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which he or she was last employed[.]

W.Va. Code § 21A-6-3(4). It was established long ago that the phrase "stoppage of work" in this context refers to the employer's operations rather than the employees' conduct. As this Court held in syllabus point two of *Cumberland & Allegheny Gas Co. v. Hatcher*, 147 W.Va. 630, 130 S.E.2d 115 (1963), *overruled on other grounds by Lee-Norse Co. v. Rutledge*, 170 W.Va. 162, 291 S.E.2d 477 (1982):

> The term "stoppage of work", within the meaning of the unemployment compensation statutes of this state, refers to the employer's operations rather than to a mere cessation of

---

[6]*See supra*, note 2.

4

employment by claimants of benefits under the provisions of such statutes; and, in order that employees may be disqualified from receiving unemployment compensation benefits because of "a stoppage of work" resulting from a labor dispute, it must appear that there has resulted a substantial curtailment of the employer's normal operations.

Explaining further, this Court stated:

It is not required that there be a complete cessation of all activities of the employer to constitute a "stoppage of work." The general rule is that the term "stoppage of work" as used in statutes of this nature is held to refer to the employer's plant operations rather than to the employees' labor, and to mean a substantial curtailment of work or operations in the employing establishment rather than a mere cessation of work by the claimants. 81 C.J.S. Social Security and Public Welfare § 190, page 283. "It is generally agreed that a stoppage of work commences at the place of employment when a definite or substantial curtailment of operations occurs * * *. The stoppage need not be complete and it will suffice if there has been a substantial curtailment of operations." 28 A.L.R.2d 322, Anno.

*Hatcher*, 147 W.Va. at 638, 130 S.E.2d at 120. Finally, this Court recognized in *Hatcher* that "[a] determination of the existence or nonexistence of a stoppage of work in a case of this nature must necessarily depend upon the facts of each case." *Id.* at 639, 130 S.E.2d at 121.

In the case *sub judice*, it is undisputed that the Clarksburg facility closed and ceased to operate during the strike. At the evidentiary hearing below, Tammy Mason, Verizon's Customer Service Supervisor, responded to questions from Verizon's attorney as follows:

5

Q: After the employees at the Clarksburg CSSC establishment went on strike, did Verizon keep that center open during the strike?
A: No.
Q: Was that establishment closed during the entire time of the strike?
A: Yes.
Q: Were any customer calls handled at that location during the strike?
A: No.
Q: Were any products sold at that location during the strike?
A: No.

**\*\*\*\***

Q: Were any services provided to customers at the [Clarksburg] facility during the strike?
A: No
Q: Were any type of services conducted at that call center during the strike?
A: No.
Q: Was any business whatsoever conducted at the Clarksburg CSSC Call Center during the strike?
A: No.
Q: Would it be fair to say that all activities at the Clarksburg CSSC Call Center ceased completely during the strike?
A: Yes.

Other evidence submitted at the evidentiary hearing showed that the calls that would have been answered by the Clarksburg facility were automatically transferred to Verizon call centers outside of West Virginia that remained open.[7] In addition, the evidence indicated that prior to the strike, Verizon generally answered 94% of the calls received within

---

[7]At the evidentiary hearing, Angela Gutierrez, Verizon's Associate Director under Work Force Planning and Analysis, testified that, nationwide, 39,000 Verizon employees went on strike. Verizon kept open fifteen of its call centers by utilizing emergency stoppage employees.

6

sixty seconds, and that during strike, it answered 87% of the calls within the same time limit although the call volume was less during this time period.[8]  Nonetheless, because Verizon utilized managers and contract workers during the strike to perform the work of its union employees at locations in other states, customers only had to wait approximately two minutes longer for service from a call center facility during the strike.  Upon consideration of this evidence, the Board concluded that there had not been a substantial curtailment in Verizon's operations during the strike because the calls that were normally handled by the Clarksburg facility were rerouted to call centers in other states and handled in a manner akin to normal operations.  Based upon "the volume of calls offered and handled per day during the strike, as compared to the volume of calls offered and handled per day before the strike, and the other productive and service statistics" submitted at the evidentiary hearing, the Board determined that "there was not a stoppage of work at [Verizon] call centers during the strike."  Specifically, the Board "concluded that there was not a stoppage of work at the [Verizon] call centers during the labor dispute, from a national or collective perspective."  Upholding the Board's decision on appeal, the circuit court stated, "it is clear that services were rendered and that such a limited reduction does not constitute a substantial curtailment."

---

[8]Ms. Gutierrez testified, "We handled 2/3 less volume at 7 percent less efficiencies [sic] due to the fact that we had less head count required to handle the calls."

In this appeal, Verizon argues that the lower tribunals erred by considering whether its nationwide operations were substantially curtailed during the strike rather than focusing on what occurred at its Clarksburg facility. By looking at the operations at call centers outside of West Virginia during the strike, Verizon contends that the lower tribunals failed to apply the plain language of the statute that requires a determination of whether a work stoppage existed "because of a labor dispute at the *factory, establishment or other premises at which [the claimant] was last employed.*" W.Va. Code § 21A-6-3(4) (emphasis added). Specifically, Verizon maintains that the phrase "factory, establishment or other premise at which [the claimant] was last employed" as set forth in the statute refers to the claimant's individual site of employment not the employer's entire operation and, therefore, the lower tribunals misapplied the substantial curtailment standard set forth in *Hatcher*. In contrast, the claimants assert that because the evidence showed that management and contract employees undertook their work during the strike and because Verizon failed to produce any evidence of lost revenue, Verizon failed to prove a subtantial curtailment of its operations.

This Court has observed that "[u]nemployment compensation statutes, being remedial in nature, should be liberally construed to achieve the benign purposes intended to the full extent thereof." Syl. Pt. 6, *Davis v. Hix*, 140 W.Va. 398, 84 S.E.2d 404 (1954). We have made clear, however, that "[t]his 'liberality' rule is not to be utilized when its application would require us to ignore the plain language of the statute." *Adkins*, 192 W.Va.

8

at 565, 453 S.E.2d at 399; *see also Davenport v. Gatson*, 192 W.Va. 117, 119, 451 S.E.2d 57, 59 (1994) ("While we recognized that unemployment compensation statutes should be liberally construed in favor of the claimant . . . we are not at liberty to ignore the plain language of a statute." (citation and footnote omitted)).[9]   Indeed, our rules of statutory construction require that "[w]here the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation." Syl. Pt. 2, *State v. Elder*, 152 W.Va. 571, 165 S.E.2d 108 (1968).  Therefore, "[c]ourts should favor the plain and obvious meaning of a statute as opposed to a narrow or strained construction." *T. Weston, Inc. v. Mineral Cnty.*, 219 W.Va. 564, 568, 638 S.E.2d 167, 171 (2006).

Courts must also read and consider a legislative enactment in its entirety because "the Legislature is presumed to intend that every word used in a statute has a specific purpose and meaning." *State ex rel. Johnson v. Robinson*, 162 W.Va. 579, 582, 251 S.E.2d

---

[9]We have also indicated:

> [I]t is . . . important for the Court to protect the unemployment compensation fund against claims by those not entitled to the benefits of the Act. . . . we believe that the basic policy and purpose of the Act is advanced both when benefits are denied to those for whom the Act is not intended to benefit, as well as when benefits are awarded in proper cases. Additionally, we believe that the Act was clearly designed to serve not only the interest of qualifying unemployed persons, but also the general public.

*Childress v. Muzzle*, 222 W.Va. 129, 133, 663 S.E.2d 583, 587 (2008) (footnote omitted).

9

505, 508 (1979). In other words, "[a] cardinal rule of statutory construction is that significance and effect must, if possible, be given to every section, clause, word or part of the statute." Syl. Pt. 3, *Meadows v. Wal-Mart Stores, Inc.*, 207 W.Va. 203, 530 S.E.2d 676 (1999). To that end, "[e]ach word of a statute should be given some effect and a statute must be construed in accordance with the import of its language. Undefined words and terms used in a legislative enactment will be given their common, ordinary and accepted meaning." Syl. Pt. 6, in part, *State ex rel. Cohen v. Manchin*, 175 W.Va. 525, 336 S.E.2d 171 (1984).

In accordance with our rules of statutory construction, the phrase "factory, establishment or other premises at which [the claimants were] last employed" in West Virginia Code § 21A-6-3(4) must be afforded its common, ordinary, and accepted meaning and be given effect. Although our focus in prior unemployment compensation cases has not been on this phrase, the physical location at which the claimant was employed prior to the strike at issue has been pivotal to the "stoppage of work" determination. For instance, in *Homer Laughlin China Co. v. Hix*, 128 W.Va. 613, 37 S.E.2d 649 (1946), this Court considered whether an employee was entitled to unemployment compensation benefits for a period of unemployment following the employee's rejection of an offer made by the employer to striking employees to return to their regular work. At the outset of that case, this Court observed that the employee had voluntarily ceased to work for the employer "because of a strike . . . which resulted in a stoppage of work at the factory of the company" where he

10

was employed.  *Id.* at 615, 37 S.E.2d at 651.  Subsequently, in *Hatcher*, this Court expressly defined "stoppage of work" as a "substantial curtailment of work or operations in the *employing establishment . . . .* [and] commenc[ing] at the place of employment."  *Id.* at 638, 130 S.Ed.2d at 120 (emphasis added and citations omitted).

More recently, in *Verizon Services Corp. v. Board of Review of WorkForce West Virginia*, No. 12-1106, 2013 WL 5967047 (W.Va. Nov. 8, 2013) (memorandum decision), a case that concerned a 2012 strike at this same Verizon location, our sole focus was on the operations at the Clarksburg facility during the labor dispute.  In that case, this Court affirmed the lower tribunals' award of unemployment compensation benefits because "Verizon continued to operate the [Clarksburg] facility [during the labor dispute] with replacement workers answering and handling customers calls."  *Id.* at *3.  Verizon's nationwide operations during the 2012 strike were not considered and, in fact, we indicated that the rerouting of calls to facilities outside of West Virginia would have supported Verizon's contention that there had been a substantial curtailment of its operations at the Clarksburg facility but "protocols on entering data had not been followed during the strike" and "the record was unclear as to how many calls were re-routed to other call centers."  *Id.*

Verizon points out that other jurisdictions that have considered the meaning of "factory, establishment and other premises" in the context of their unemployment

11

compensation laws have also concluded that these words refer to distinct employment locations rather than an employer's facilities as a whole. As one court explained,

> [t]he word "establishment," has a clear and natural meaning as a distinct place of business. In other words, "establishment" as used in this [unemployment compensation] act connotes a place of employment. The fact that, as here, an employer conducts a highly integrated business composed of individual units spread over many states with the operation of each unit interdependent on the operation of other units does not constitute such business as an "establishment" within the meaning of this act.

> To hold as urged by the appellant would render superfluous the use by the General Assembly of the words, "factory and other premises," in conjunction wi[t]h "establishment," since the word "establishment" itself would include factories and other premises.

*Abnie v. Ford Motor Co.*, 194 N.E.2d 136, 138 (Ohio 1963).

The Court of Appeals of Maryland reached the same conclusion in *Giant Food, Inc. v. Dept. of Labor,* 738 A.2d 856 (Md. 1999). In that case, the employer, who operated a grocery store chain, argued that its distribution and warehouse employees were not entitled to unemployment compensation benefits during a work stoppage caused by a month-long strike. The lower tribunals awarded the striking workers unemployment benefits because the grocery chain was able to remain open during the labor dispute as the employer had overstocked the stores in anticipation of the strike and used other wholesalers and suppliers to ships goods directly to its retail locations. Reversing the decision that awarded unemployment compensation benefits, the Maryland court held that "the term 'stoppage of

12

work' refers to the substantial curtailment of work at each individual facility, premises, or individual department within such facility." *Id*. at 870. The court explained:

> Since its passage, our understanding of the operation of the labor disqualification provision has been that, in order for claimants to be disqualified from receiving benefits, there must be both a labor dispute and a work stoppage at the individual place, site, factory, workshop, establishment, or premises where they worked.

*Id.* at 865. Accordingly, the court concluded that "[b]ecause operations ceased at the various premises in which the employees worked in this case, there was a 'stoppage of work' at each of these locations cause by the labor dispute in question." *Id.* at 870; *see also Ahnne v. Dept. of Labor and Indus. Relations,* 489 P.2d 1397, 1401 (Haw. 1971) (stating that "[t]he word 'establishment' should be given its natural meaning . . . refer[ring to a building or group of proximate buildings, but, generally speaking . . . not refer[ring] to locations many miles apart"); *Ford Motor Co. v. Unemployment Comp. Comm'n of Va.,* 63 S.E.2d 28, 33 (Va. 1951) (finding "[t]he word 'establishment,' coupled as it is in the Virginia Act with the words 'factory' and 'other premises' means . . . the place of business where the worker was employed . . . each characterizes and designates the kind of place at which the employees work and not the manner of its operations"); *Ford Motor Co. v. N.J. Dept. of Labor and Indus.,* 76 A.2d 256, 260 (N.J. 1950) (explaining "the statutory sense of the term 'establishment' is not embracive of the whole of Ford's far-flung enterprise as a single industrial unit" and its "normal usage in business and government" is "reference to a distinct physical place of business").

13

The claimants contend that the cases Verizon relies upon are factually distinguishable because they mostly concern the auto industry and that *Mountain States Tel. and Tel. Co. v. Sakrison*, 225 P.2d 707 (Ariz. 1950), which this Court looked to for guidance in *Hatcher*, supports their position that the term "establishment" encompasses all of the employer's operations. In *Hatcher*, we found *Mountain States* to be instructive concerning the factors to be considered "in measuring the degree of curtailment of the employer's operations resulting from the strike." 147 W.Va. at 642-43, 130 S.E.2d at 123. In that regard, we recognized that "marked decrease[s]" in revenue, services and employment would be indicative of a substantial curtailment of the employer's operations. *Id.* In this instance, however, the claimants rely upon *Mountain States'* determination that "the company's statewide system constituted a 'single establishment' for the application of the statute." *Id.* at 711.

Similar to the case at bar, *Mountain States* involved a nationwide strike of affiliated telephone and telegraph companies and required the appellate court to discern the meaning of the words "establishment and other premises" as set forth in Arizona's "Employment Security Act." 225 P.2d at 709. Noting that other courts had defined "establishment" as a "place or area of employment," the Arizona court, nonetheless, concluded in summary fashion that the Employment Security Commission had not erred when it "decided that the nature of the company's business and operation required the

14

conclusion that the statewide system constituted a 'single establishment' for the application of the statute." 225 P.2d. at 710-11. We do not find *Mountain States* to be reflective of the approach taken by most courts regarding the definition of "establishment," nor is it supportive of the claimants' position in this case. Here, the claimants contend that the term "establishment" encompasses all of Verizon's operations nationwide. Yet, even *Mountain States* limited its definition of "establishment" to the employer's "statewide system." *Id.* As the *Ahnne* court noted,

> [a]n occasional court has given special emphasis to the "functional integration" of interrelated plants, and grouped separate locations into a single establishment, but that approach has been generally rejected. The factor most courts emphasize in determining when employees occupy distinct establishments is the physical location where the employees work. Employees working in a separate geographical situs are classified into a separate establishment.

489 P.2d. at 1400 (footnotes omitted). *See also Abnie*, 194 N.E.2d at 138 (observing that arguments pertaining to "functional integration are "[a]lmost unanimously . . not well taken" and most courts define "establishment" as "distinct place of business" or "place of employment"); *Walgreen Co.v. Murphy,* 53 N.E.2d 390, 394 (Ill. 1944) (refusing to add "a test of functional integration" not prescribed by statute).[10]

_____

[10]Even where functional integration has been considered to determine whether multiple plants constitute a single "establishment," physical proximity has also been deemed highly relevant. *See Hilley v. Gen. Motors Corp.*, 800 So.2d 167, 173 (Ala. Civ. App. 2000) (finding strike at Ohio plant and resulting unemployment at functionally-integrated Alabama plants several states and several hundred miles away "did not occur in the same 'establishment'").

15

Based on all the above, we now hold that the phrase "factory, establishment or other premises at which he or she was last employed" in West Virginia Code § 21A-6-3(4) (2012) means the distinct geographical location where the claimant was last employed prior to the labor dispute.[11]  Applying our holding to the facts of this case, we find that the lower tribunals erred by considering Verizon's nationwide operations to determine whether a "work stoppage" occurred during the 2016 strike.  In light of the undisputed evidence submitted at the evidentiary hearing, we further find that there was a "substantial curtailment" of Verizon's operations at the Clarksburg facility during the 2016 labor dispute.  As discussed above, no employees, union or otherwise, worked at the Clarksburg facility during the labor dispute, and the facility completely ceased to operate for the entire strike period.  Consequently, no products were sold, no services were rendered, and no revenue was generated from this Verizon location from April 13, 2016, to May 21, 2016.  Therefore, a "work stoppage" occurred at Verizon's  Clarksburg facility during the 2016 labor dispute which disqualified the claimants for unemployment compensation benefits under West Virginia Code § 21A-6-3(4).[12]

---

[11]We recognize that our holding today will have limited application in light of the 2017 amendment to West Virginia Code § 21A-6-3(4).

[12]Having found the claimants were disqualified for unemployment compensation benefits under West Virginia Code § 21A-6-3(4), we need not address Verizon's argument with respect to other subsections of the statute.

16

## IV. Conclusion

Accordingly, for the reasons set forth above, the final order of the Circuit Court of Kanawha County entered on February 22, 2017, is reversed, and the case is remanded for entry of an order denying the claimants' applications for unemployment compensation benefits.

Reversed and remanded with directions.